FILED

2013 Sep-27  PM 04:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **RONNIE RACHELLE BURNETTE**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 12-CV-02380-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

The claimant applied for disability insurance income under Title II of the Social Security Act, as well as for supplemental security income under Title XVI on October 28, 2009. The claimant alleges that she became disabled on May 26, 2009 because of back and shoulder injuries with effects radiating to other parts of her body, listed on the Disability Determination and Transmittal form as degenerative joint disease with a secondary diagnosis of cervicalgia. (R. 60, 121-26).

The agency denied her claim as to the disability insurance as well as the supplemental security insurance claims on December 31, 2009. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on April 18, 2011. The ALJ rendered an unfavorable decision on June 17, 2011. The Social Security Administration Appeals Council denied her request for review of the ALJ's decision, and consequently, the

ALJ's decision became the final decision of the Commissioner of the Social Security Administration.  (R. 62, 84, 8, 1).

The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reason stated below, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUE PRESENTED

Whether the Appeals Council erred by failing to remand the case to the ALJ for reconsideration after the claimant presented new and material evidence.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 401 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

2

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  To

make this determination the Commissioner employs a five-step, sequential evaluation process.

*See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

When the claimant submits "new and material" evidence "relat[ing] to the period on or

before the date of the administrative law judge hearing decision" to the Appeals Council after the

ALJ hearing, and the Appeals Council makes the new evidence part of the record, this court may

determine that the failure of the Appeals Council to adequately consider that evidence warrants a

remand.  *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987).  Such evidence is considered

material and potentially worthy of remand upon non-consideration if "there is a reasonable

possibility the new evidence would change the administrative outcome."  *Id.*  The Appeals

Council may not merely "perfunctorily adhere" to the ALJ's general reasoning it considers the

new evidence but upholds the ALJ's decision, instead it must adequately explain why it denied

review.  *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1987); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007) (holding that remand was appropriate in light of new evidence presented to the Appeals Council to determine if the ALJ's finding was still supported by substantial evidence).  This court has the authority to remand a case based on such evidence pursuant to 42 U.S.C. § 405(g), under a sentence four remand or reversal.  *Id.*; *see also* 20 C.F.R. §§ 404.940, 404.946.

## V. FACTS

The claimant is a high school graduate and was thirty-six years of age on the date of the administrative hearing.  Her past employment experience before the alleged onset of disability on May 26, 2009 includes work as a fast food crew member; an instant photo lab technician; a cook and cashier in a service station; and a pharmacy distribution center receiving clerk through a temp agency.  (R. 30, 148, 162).

The claimant alleges that in May 2009 an injury to her back and shoulder caused her pain sufficient to prevent her from continuing to work.  The claimant's original application for disability insurance under Title II of the Social Security Act, as well as for supplemental security income under title XVI, listed her condition as a primary diagnosis of degenerative joint disease with a secondary diagnosis of cervicalgia.  (R. 33, 60).

*Physical Limitations*

As early as August 17, 2006, the claimant sought treatment from Dr. Ken Puckett through the Columbiana Clinic located in Columbiana, AL, complaining of pains in her shoulder, chest, and arm.  The claimant also visited Dr. Puckett in September 2006, February 2007, and August

2008.  In these visits, the claimant complained of other issues such as sinus pressure and a cough. (R. 215-18).

On May 26, 2009, the claimant visited Dr. Puckett at the Columbiana Clinic complaining of pain radiating from her back to other parts of her body.  Dr. Puckett diagnosed the claimant with cervical and thoracic strain and noted the patient's scapular pain radiating to other parts of the body.  (R. 214).

During a visit to Dr. Puckett on June 2, 2009, the claimant described improved levels of cervical pain, but reported that after attempting to do laundry, she experienced back pain so severe that it felt "like labor pains."  Dr. Puckett noted numbness and tingling in the claimant's back.  Dr. Puckett also indicated his intent to refer the claimant to an orthopedic specialist for further analysis and treatment.  On the same date, Dr. Puckett completed a rehabilitation referral form referring the patient to Orthopedic Specialists of Alabama.  (R. 213, 254).

On Dr. Puckett's referral, Dr. Lloyd Johnson with Orthopedic Specialists of Alabama examined the claimant at the Shelby Clinic on June 3, 2009.  Dr. Johnson's notes from the visit described her specific complaint as pain beginning a week prior, located in her mid-upper-right thoracic region, and radiating down her back and into other parts of the body.  Dr. Johnson determined that the claimant was in no acute distress, had full elevation of the right shoulder, and had mild tenderness.  Dr. Johnson's official diagnosis consisted of degenerative disc disease; thoracic back pain and lumbar back pain; and right shoulder and subscapular bursitis.  Dr. Johnson recommended physical therapy and that the claimant be placed on sedentary duty temporarily, with the note that "we may be able to return her to full duty next time."  He also

indicated that if her condition was not improved by her next visit, he would order an MRI.  (R. 238-39, 269).

On June 10, 2009, Dr. Puckett examined the claimant again at the Columbiana Clinic.  In his notes, Dr. Puckett noted that the claimant was seeing Dr. Johnson and that she was receiving physical therapy twice weekly.  On the same day, Dr. Puckett filled out both an insurance and work status report on the claimant's behalf, for the benefit of her referral to Orthopedic Specialists of Alabama and for Aetena Insurance, respectively.  On these reports, Dr. Puckett listed the dates that he saw the claimant for the issue, and detailed to the orthopedic specialist the reasons for referral, including his recommendation of physical therapy.  Dr. Puckett stated on the work status form that the claimant's condition would "possibly" involve pain flare-ups preventing her from completing her job, but that this issue might resolve itself over time.  On both the insurance and work status form, Dr. Puckett indicated that the claimant would be restricted from job functions that involved "lifting, bending, or stooping."  On the insurance form, Dr. Puckett indicated that in light of the specific conditions above, he would describe the claimant as "Class 4," meaning that she possessed "[m]arked limitation of functional capacity/capable of sedentary work."  He also indicated on the form that the claimant was competent to endorse checks.  Dr. Puckett indicated on the form that the claimant's prognosis was "good," and further indicated that he expected fundamental changes in her condition in one to two months.  (R. 212, 195-98).

The claimant visited Dr. Johnson for a follow-up visit on June 17, 2009 at the Shelby Clinic.  Dr. Johnson noted  little change in her physical condition, recording some back pain and a right shoulder impingement.  Dr. Johnson gave her a local injection of betamethasone,

lidocaine, and Marcaine in her right shoulder.  Dr. Johnson indicated that he would examine her again after an MRI scan.  (R. 240).

By Dr. Johnson's referral, Tower Imaging in Alabaster, AL performed an MRI on the claimant the next day, June 18, 2009.  The MRI suggested a small synovial cyst on the L5-S1 articular facet joint without any apparent encroachment on surrounding structures, but was otherwise unremarkable.  (R. 266).

The claimant visited Dr. Johnson again on June 22, 2009 for a follow-up on her MRI.  Dr. Johnson again noted back pain and right shoulder impingement.  He recommended continued physical therapy with specific focus on her right shoulder; an MRI of her shoulder; and the use of a transcutaneous electrical nerve stimulation unit on her back.  (R. 237).

The claimant saw Dr. Puckett at the Columbiana Clinic on June 23, 2009.  Dr. Puckett noted continuing pain radiating throughout her shoulder and lower back and also noted that the claimant was not taking Lortab at that time.  He also referenced her follow-up with Dr. Johnson and her ongoing physical therapy.  (R. 211).

The claimant saw Dr. Puckett again on July 7, 2009.  He noted continuance of her same symptoms, specifically noting pain in the area at the base of her neck.  He recorded the claimant as describing herself as "in a lot of pain." (R. 210).

The claimant saw Dr. Johnson on July 20, 2009.  Dr. Johnson again assessed the claimant with back pain, right shoulder impingement, and neck pain. Dr. Johnson noted that the claimant was in no acute distress; had suffered no motor or sensory deficit in the upper extremities; and had some tenderness in the right trapezius, cervical spine, and lumbar spinal areas.  Dr. Johnson indicated that the claimant's previous pain medication, Ultram, had proven ineffective, and that

she was taking Mobic.  Dr. Johnson ordered an MRI of the claimant's right shoulder and a follow-up visit after the MRI.  (R. 283, 295).

An MRI taken of claimant's shoulder at Tower Imaging on July 22, 2009, indicated the possibility of a small glenoid labral tear.   Other musculature and tendons affecting range of motion appeared normal.  (R. 271).

The claimant visited Dr. Johnson on July 23, 2009 for a follow-up visit after her MRI. Dr. Johnson noted that the claimant was in no acute distress and that she had the full range of motion of her right shoulder with no focal motor or sensory deficits.  Dr. Johnson's official assessments were back pain and right shoulder pain, with a concern for her superior glenoid labral pathology.  He indicated that he was referring her to physiatry for further non-operative treatment for her back and recommending that she continue physical therapy.  He also indicated that she should have an MRI on her back if her symptoms had not improved within two months and schedule a follow-up with him.  (R. 302).

On August 4, 2009, Dr. Michelle Turnley saw the claimant at St. Vincent's East Clinic through Dr. Johnson's referral.  Dr. Turnley's notes indicated that claimant's MRI results showed signs of mild arthritis and discussed the claimant's physical therapy and Naprosyn prescription. Specifically, she noted that the claimant experienced some temporary relief from the physical therapy, but that the prescription did not seem to be helping much.  Dr. Turnley described the claimant as having full range of motion in forward flexion, extension, and left and right lateral rotation.  She also noted full motor strength and normal neurological exam of the upper extremities.  She described tender and trigger points near the claimant's upper and mid trapezius and right scapular border.  Dr. Turnley's examination of claimant's lumbar spine revealed full and

complete range of motion, with some tenderness and gluteal trigger points in the area.  Dr. Turnley recommended trigger point injections and the claimant agreed.  Dr. Turnley proceeded with targeted injections of betamethasone, marcaine, and lidocaine into the claimant's lumbar spine.  Dr. Turnley reported no adverse effects or reactions to the procedure.  Dr. Turnley also prescribed Davrocet and Savella before discharging the claimant in good condition.  (R. 245-46).

The claimant saw Dr. Puckett again on August 24, 2009.  Dr. Puckett noted the treatment that the claimant had receieved from Dr. Turnley and noted significant reduction of pain levels in the claimant's shoulder and lumbar spine.  He otherwise made the same diagnoses of shoulder, thoracic, and cervical strain.  (R. 209).

In a visit to Dr. Turnley on the same day at Trinity Clinic, Dr. Turnley opined that the claimant might be experiencing cervicothoracic myofascial pain and somatic dysfunction, along with her lower back pain.  Dr. Turnley noted some improvement in the claimant's pain levels since the injections and performed another round of injections on the claimant.  Dr. Turnley opined that claimant would be capable of participating in light and light-medium work, or anything less strenuous.  (R. 244, 247).

Dr. Johnson saw the claimant at the Shelby Clinic on September 8, 2009.  He noted the procedures that Dr. Turnley had performed on the claimant as well as Dr. Turnley's recommended work restriction level, noting also that the claimant still had some back pain made worse with activity.  Dr. Johnson again described the claimant as in no acute distress, with full forward elevation of the right shoulder and no focal motor deficits in the upper extremities.  Dr. Johnson indicated a need for an MRI scan of the claimant's cervical spine based on his concern

9

for the claimant's pain in that area and also indicated that the claimant would continue to follow-up with Dr. Turnley for her back pain.  (R. 234).

Dr. Turnley completed an attending physician statement for Aetena Insurance on September 9, 2009, listing diffuse myalgia as her primary diagnosis.  On the form, Dr. Turnley indicated that she did not consider surgery a future treatment option and listed under the claimant's treatments her medications Darvocet and Savella as well as physical therapy.  Also on the form, Dr. Turnley described the claimant's level of impairment as "Class 2: . . . capable of medium manual work."  (R. 258, 231-32).

An MRI taken at Tower Imaging on September 9, 2009, at Dr. Johnson's request, proved "unremarkable."  (R. 251).

Dr. Johnson's notes from the claimant's September 10, 2009 visit indicated the same lack of acute distress, along with full elevation of her right shoulder and a lack of herniation or need for any surgical intervention.   He prescribed and performed an injection containing betamethasone and lidocaine at the medial border of the scapula and recommended physical therapy targeted at the same area. Dr. Johnson's stated goal was to return the claimant to work within a month, pending successful treatment as described.  (R. 235).

An MRI taken on September 17, 2009, at the referral of Dr. Robert Wolf, revealed no significant findings.  (R. 250).

The claimant visited Dr. Johnson again on September 22, 2009.  Dr. Johnson noted that she had full forward elevation of the right shoulder, with motor and sensory functions intact.  He noted that the claimant reported aggravated pain as a result of her physical therapy activities.  Dr. Johnson stated that he had reviewed the claimant's MRI results, including the MRI taken

10

September 17, 2009 on Dr. Wolf's referral.  Dr. Johnson recommended that the claimant continue physical therapy; indicated that he would review her case with Dr. Robert Mathis to see if they could do anything else; and ordered that the claimant report back to him for a follow-up. (R. 241).

On September 25, 2009, the claimant sought treatment with Dr. Puckett at the Columbiana Clinic.  Dr. Puckett noted a continued diagnosis of cervical, lumbar spine, and shoulder pain and noted that the claimant felt like her pain was worse in her lower spine.  Dr. Puckett referenced her continued physical therapy and visits to Dr. Johnson and the other specialists.  (R. 207).

On October 2, 2009 through Orthopedic Specialists of Alabama at Dr. Johnson's request, Dr. Chad Mathis offered his consultive opinion regarding the claimant's condition and further treatment options.  Dr. Mathis stated that the claimant would benefit from multidirectional instability nonoperative protocol and that she was suffering from S.I.C.K. scapula, a comprehensive condition affecting instability in the shoulder region.  To this end, he recommended an alternation of her existing rehabilitation program, but not surgical intervention. (R. 272).

On October 28, 2009, J. Ross completed a field office disability form regarding the claimant.  The report described the claimant as very pleasant with no difficulty in furnishing information during the telephone interview, and with no difficulty hearing, reading, breathing, understanding, concentrating, talking, or answering coherently.  The claimant described her own conditions and injuries that prevented her from working as problems using her right arm due to S.I.C.K. scapula, as well as lower back pain that was being treated by shock therapy.

Specifically, the claimant stated that these conditions render her unable to reach above her head or to "pick up heavy stuff," unable to stoop and bend, and unable to turn her neck.  The claimant stated generally that her symptoms and conditions prevent her from working, that they had begun on May 26, 2009, and that she had discontinued working since that date as a result of her doctor's recommendation.  The claimant also listed the prescriptions she had been issued for her conditions, including Darvocet by Dr. Turnley, and Mobic and Zanaflex by Dr. Puckett.  The claimant described the tests she had been given, including a blood test by Dr. Puckett in May 2009, an MRI/CT scan of her shoulder and lower back, and an x-ray of her shoulders and lower back, both also recommended by Dr. Puckett.  (R. 148-58).

On an October 30, 2009 visit at the Shelby Clinic, Dr. Johnson noted that the claimant described no relief from her symptoms and that x-ray imaging showed no evidence of fracture, glenohumeral joint subluxation, or osteoarthritis.  Dr. Johnson also reviewed the claimant's MRI imaging from September 17, 2009 that showed fatty replacement in the thoracic spine, without disc herniation.  Dr. Johnson again noted full forward elevation of both shoulders with negative impingement signs and issued a diagnosis of multidirectional instability of both shoulders and upper thoracic back pain.  He also wrote the claimant a prescription for Lortab to help with the pain and indicated that she should continue pain management and care under Dr. Turnley's oversight.  (R. 242).

A November 5, 2009 report[1] issued regarding the claimant's visit to the Alabama Orthopedic Center described claimant as being in no acute distress, with no atrophy, wringing,

---

[1]The document within the record is titled "Medical Records History" from Alabama Orthopedic Center, P.C., and contains no individual physician's name or signature.

erythema, swelling, or warmth. The report also indicated that the claimant was neurovascularly intact and that she had full range of motion in her bilateral upper extremities.  The report further noted that the claimant had no shoulder joint pathology and that her symptoms likely resulted from retroscapular bursitis and tendonitis.  The report also described her past MRI results as normal, other than the mild tendinitis in her rotator cuff, and recommended no further treatment aside from that already prescribed.  (R. 202).

The claimant sought treatment at St. Vincent's East Clinic on November 10, 2009 from Dr. Turnley.  Dr. Turnley noted no acute illness; tenderness and trigger points in the right upper trapezius; and normal motor and sensory functions of the same area.  Dr. Turnley's impression was persistent cervicalgia and cervicothoracic myofascial pain.  She prescribed Lortab, as well as Mobic and Gabapentin, and recommended that the claimant follow up within a month.  (R. 232).

The claimant saw Dr. Puckett at the Columbiana Clinic on November 12, 2009.  Dr. Puckett made note of the claimant's visits to the other specialists and her various prescriptions, and again noted neck and shoulder pain.  (R. 205).

The claimant saw Dr. Turnley again at St. Vincent's East Clinic on December 8, 2009.  Dr. Turnley noted little change in her appearance, trigger points, and motor and sensory function.  She opted to keep the claimant on her prescriptions, and asked her to follow up again in two months.  (R. 231).

The claimant saw Dr. Puckett at the Columbiana Clinic on December 15, 2009.  Dr. Puckett referenced the claimant's visits with Drs. Turnley and Mathis, and noted neck and back pain.  He also indicated that the claimant might have suffered a trapezius spasm and that the

claimant reported pains in her neck "moving up."  Dr. Puckett also recorded cervical and thoracic strain.  (R. 309).

Ophelia Collins completed a Residual Functional Capacity (RFC) assessment for the claimant on December 30, 2009.  In the RFC, Ms. Collins listed the claimant's primary diagnosis as cervicalgia, with a secondary diagnosis of degenerative joint disease.  Under the Exertional Limitations section of the assessment, the report described the claimant as capable of occasionally lifting and/or carrying items up to twenty pounds.  The report also described the claimant as capable of frequently being able to lift and carry items up to ten pounds.  The same section of the RFC described the claimant as able to stand or walk, with normal breaks, for about six hours out of an eight hour workday; sit for up to six hours out of an eight hour workday; and push and/or pull, including operation of controls, for an unlimited amount of time, other than time described to lift and/or carry.  In the space provided for references and evidence supporting these conclusions, Ms. Collins referenced the claimant's visits to the various orthopedic specialists through Orthopedic Specialists of Alabama on the following 2009 dates: June 3, June 22, July 23, August 24, September 9, September 17, September 22, October 20, and November 10.  Ms. Collins noted that among these visits, the common diagnoses referenced included full forward elevation of both shoulders and 70% external rotation; no focal motor deficits; tender trigger points in right shoulder; an MRI showing a possible tear;  preservation of disc spaces with no fracture; degenerative disc disease of the lumbar spine without sciatica; and right shoulder bursitis.  (R. 52-60).

Under the postural limitations portion of the RFC, Ms. Collins described the claimant as capable of occasionally climbing a ramp or stairs, balancing, stooping, kneeling, crouching, and

crawling, but never capable of climbing a rope, ladder, or scaffolds.  The RFC contained no manipulative, visual, or communicative limitations.  Under environmental limitations, the RFC indicated that the claimant should avoid concentrated exposure to extreme temperatures, as well as hazards such as machinery and heights, but provided no further environmental restrictions.  In support of the preceding assessments, Ms. Collins referenced the claimant's August 24, 2009 visit to Dr. Turnley through Orthopedic Specialists of Alabama that included a diagnosis of possible cervicothoracic myofascial pain, somatic dysfunction, but a full range of the lumbar spine, and normal motor and sensory function.  Ms. Collins also referenced the claimant's August 4, 2009 visit to Dr. Turnley that contained a diagnosis for possible fibromyalgia, but full and complete motion and range of the lumbar, normal muscle bulk and strength, and good disc spacing in cervical x-ray.  (R. 52-60).

In the final additional comments section of the RFC, Ms. Collins generally concluded that the claimant's alleged problems are right arm and low back pain and that her symptoms and functional limitations are difficulty standing and reaching.  Ms. Collins further opined that the claimant does have a medically determinable impairment that could be reasonably expected to produce her stated symptoms and functional limitation, but that generally the claimant's testimony about her symptoms and limitations was only partially credible.  (R. 59).

The claimant continued to regularly visit her attending physician, Dr. Puckett.  On her December 15, 2010 visit to the Columbiana Clinic, Dr. Puckett described chronic lower spinal pain; tenderness in the lower spine; and cervical, thoracic, and lower spinal strain.  He also documented a flare-up the claimant had experienced with pain traveling down her right leg into her thigh.  (R. 310).

The claimant also visited Dr. James P. Beretta, a specialist in pain medicine and anesthesiology, at St. Vincent's hospital on June 4, 2010. Dr. Beretta treated the claimant with a direct epidural steroid injection of Kenalog and 0.5% Xylocaine on the right side of her spine. The operative reports listed her diagnosis as cervical degenerative disc disease. (R. 320).

The claimant again saw Dr. Puckett at the Columbiana clinic on June 16, 2010. Dr. Puckett noted the procedure performed by Dr. Beretta and also noted continued lower back pain, thoracic pain, and shoulder and neck pain. Dr. Puckett again noted tenderness in the claimant's thoracic and lower spinal area. He noted that the claimant was to follow up with Dr. Beretta on the pain blocks she received. (R. 311).

On July 6, 2010 through St. Vincent's Hospital, Dr. Beretta treated claimant with a direct sacroiliac injection of Kenalog and 2% Xylocaine, and the operative note listed her diagnosis as sacroiliac joint dysfunction. (R. 319).

Dr. Puckett saw the claimant at the Columbiana Clinic on August 4, 2010. He noted the pain block treatment performed by Dr. Beretta. He also again recorded flare-ups of neck pain, lower back pain, thoracic pain, and scapular pain. (R. 312)

In a January 3, 2011 progress note, Dr. Beretta described the claimant's history of neck pain also affecting her right lower back. He also noted that portions of the claimant's cervical spine were tender and listed the range of motion in the area as 1/2 and the muscle function as 4/5. He mentioned similar tenderness and range of motion and muscle in her lumbar spine. Under his plan for treatment, Dr. Beretta recommended cranial electrotherapy stimulation treatment, as well as the medications Ultracet for pain and Mobic for inflammation. Dr. Beretta did not provide any recommendations or restrictions regarding the claimant's ability to work. (R. 315, 314-21).

16

On April 26, 2011, Dr. Ken Puckett, the claimant's longtime treating physician, filled out an insurance form for MetLife. On the form, Dr. Puckett listed as his diagnosis thoracic pain and joint pain arthralgia, and listed the claimant's medications, Mobic and Tramadol. In the capabilities assessment portion of the form, Dr. Puckett noted that the claimant could potentially stand and walk for only one to two hours intermittently and sit continuously for only up to one hour. He indicated that she lacked the ability to climb, bend or stoop, reach above shoulder level, operate a motor vehicle, or push or pull with either hand. In the same portion of the form, as well as on a separate visit note also from April 26, 2011, Dr. Puckett indicated that the claimant was unable to lift items weighing less than five pounds safely or steadily and that she could only work up to two hours a day. Dr. Puckett indicated that he expected no improvement in the claimant's condition in any area. He further indicated that accordingly, he had not advised the claimant to return to work, with the cited reason of persistent pain. He noted that his recommendation, which he discussed with the claimant, was for her to continue in a pain management program. (R. 322-25).

### The ALJ Hearing

The Commissioner denied the claimant's request for disability insurance income and supplemental security income after which the claimant properly requested and received a hearing before an ALJ on April 8, 2011. (R. 7, 27).

At the hearing, the claimant testified regarding the nature of her past employment, as well as alleging that she ceased work in May of 2009 due to her injury. The claimant confirmed that she received $5,000 from her employer as a nuisance value following an attempted workers

compensation claim; that she also received long-term disability benefits from MetLife; and that she was still receiving those benefits at the time of the hearing.  (R. 33-34).

The claimant testified that her injury was in her shoulder and back, with the pain radiating to other parts of her body, including her head.  The claimant indicated that surgery was not among the suggested options from any of the specialists she had visited since her alleged injury. She described what attempted remedies her doctors had prescribed, including physical therapy, various anti-inflammatory and pain medications, and targeted injections.  The claimant testified that one of her physicians, Dr. Beretta, had described the purpose of the targeted injections he performed on the claimant as simply keeping her pain to a minimum.  The claimant addressed specifically an MRI that revealed a partial tear, noting that no surgery was suggested despite such a result, and that Dr. Beretta had simply recommended another MRI.  (R. 35-38).

The claimant described her family and daily schedule, stating that during any given day, she did not do much or take care of many of the more strenuous household activities because her daughter and ex-boyfriend could help out around the house. She stated that she and her three-year-old daughter "hang out" at home throughout the day while her other children are away at school.  The ALJ inquired whether she needed to rest during the day, and the claimant said that typically she would need to lie down and rest for "half the day."  She also stated that she took pain medication multiple times daily.  She testified that she was able to care for herself generally and able to prepare simple meals.  (R. 38-39).

The claimant described the pain medications she had been prescribed, including Mobic and Ultracet.  The claimant stated that she switched between specialists she was seeing at one point because driving was painful for her and the trip to the more distant specialist aggravated

18

her condition.  The claimant testified that on a scale of one to ten, she was at an "eight" or "nine" in terms of her pain level daily while using her medication.  The claimant stated that she was willing to work and that MetLife had attempted to find her employment, but that she believed even sedentary work would cause her pain without the ability to lie down and rest.  The claimant specifically stated that she could sit comfortably for no more than thirty minutes before experiencing pain.  (R. 41-48).

The ALJ then heard the testimony of Dr. Joshua Tilton, a vocational expert.  Dr. Tilton confirmed that he had a chance to examine the record and consider the nature of the claimant's past work experience.  The ALJ then gave Dr. Tilton a hypothetical based upon claimant's age and past work experience, but limited to the light unskilled level of exertion, with no more than occasional bending, stooping, crouching, crawling, or kneeling, and no more than frequent overhead reaching with the right upper extremity.  Given this hypothetical, Dr. Tilton testified that possible positions within those restrictions included fast food worker at the "light" level, cashier, storage facility rental clerk, laundry worker, and automatic car wash attendant.  Dr. Tilton further stated that positions were available in the region in significant numbers for all of those jobs listed.  The ALJ then inquired as to which, if any, of those or other jobs would be available if the worker was forced to lie down and rest every few hours or suffered from effects of chronic pain. Dr. Tilton replied that no positions would be available in the national economy given those stipulations.  (R. 47-51).

### *The ALJ's Decision*

On June 17, 2011, the ALJ found that claimant was not eligible for any of the benefits for which she applied.  The ALJ found that under the five-part analysis for determining disabled

19

status, the claimant had met the insured status requirements of the Social Security Act.  The ALJ further found that the claimant had not engaged in any substantially gainful activity.  The ALJ found that the claimant suffered from the following severe impairments: degenerative disc disease, bursitis, and history of cervical and lumbar (thoracic) strain.  The ALJ stated that while the claimant suffered from these conditions, the evidence in the record showed no nerve root compression, arachnoiditis, or lumbar stenosis.  Therefore, the ALJ found that the claimant's impairments did not qualify her as disabled pursuant to the listings.  The ALJ found that the claimant could not engage in any past relevant work in view of her condition, symptoms, and the testimony of the vocational expert.  (R. 13-14, 19-20).

The ALJ concluded that in light of the entire record, the claimant had sufficient residual functional capacity to perform light, unskilled work given certain restrictions.  In arriving at this conclusion, the ALJ utilized the accepted pain standard.  First, the ALJ determined that the claimant's conditions capable of causing her claimed level of disability were medically demonstratable through medical evidence contained in the record.  Next, the ALJ evaluated  the claimant's alleged level of pain or disability in light of the medical evidence, testimony, and the record as a whole.  Specific factors that the ALJ indicated he used in his evaluation included the claimant's testified-to daily activities, the nature of her symptoms, her use of medication, and the treatments which her doctors prescribed or recommended.  (R. 16-20).

After consideration of the medical evidence in the entire record, the ALJ found that the claimant's condition might be reasonably expected to cause the alleged symptoms, but that the claimant's testimony regarding the level or intensity of those symptoms was not consistent with the evidence and assessment of her RFC as a whole.  (R. 17).

The ALJ then recounted the findings and evidence provided by the claimant's physicians. First, the ALJ discussed the findings of Dr. Ken Puckett, the claimant's treating physician. The ALJ noted that Dr. Puckett consistently diagnosed the claimant with cervical and thoracic strain and opined that the claimant might not be able to "stoop, bend, or lift." The ALJ also noted Dr. Puckett's opinion that the claimant might suffer from difficult to predict flare-ups that would prevent her from working, but that such flare-ups might improve over time.[2] The ALJ did accept Dr. Puckett's general diagnoses, but stated, *without explaining why*, that he disagreed with his work level and restrictions, and gave those portions of Dr. Puckett's testimony little weight. (R. 17).

The ALJ also discussed the medical evidence from the specialists the claimant had visited through Orthopedic Specialists of Alabama. The ALJ noted that in sum these visits showed degenerative disc disease without effects of sciatica, and right shoulder bursitis; full elevation and rotation of her joint; and no spinal disc spaces or fractures. The ALJ noted that one of the claimant's MRIs showed a possible tear, but noted that her other tests proved unremarkable. Specifically, the ALJ referenced the evidence showing full forward elevation of the claimant's right shoulder; full range of motion of her lumbar; and full motor and sensory functions in her bilateral upper extremities. The ALJ also noted that further examination also showed no acute distress, atrophy, winging, erythema, swelling, or warmth, despite some tender trigger points. The ALJ also pointed out that examination of the claimant's shoulder area showed no fracture or

---

[2]At the time that the ALJ made his decision, Dr. Puckett's more recent evaluations from April 26, 2011, which included the opinion that the claimant's condition would *not* improve, were not yet included in the record.

dislocation and full use of muscle groups, and that MRI results showed normality in her cervical spine.  (R. 17).

The ALJ then discussed the opinions individually of the specialists that examined claimant, beginning with Dr. Lloyd Johnson.  The ALJ noted that Dr. Johnson diagnosed the claimant with degenerative disc disease of the lumbar spine; subscapular bursitis; thoracic and lumbar back pain; and prescribed medication with physical therapy.   The ALJ afforded "great weight" to Dr. Johnson's findings "to the extent that they [did] not conflict with the [RFC]."  (R. 18).

The ALJ next discussed the evidence from Dr. Chad E. Mathis.  The ALJ discounted Dr. Mathis's opinion, including his statement that the claimant might suffer from S.I.C.K. scapula, finding that it was not supported by the "records as a whole."  (R. 18).

The ALJ next discussed the evidence from Dr. Michelle Turnley.  The ALJ noted that Dr. Turnley found mild arthritis in the claimant's spine, and as part of her opinion on claimant's pain level and ability, noted that claimant could participate in light or medium light work.  The ALJ noted that Dr. Turnley prepared a physician statement for Aetena Insurance on September 9, 2009 that indicated claimant was capable of performing medium manual work.  The ALJ discounted Dr. Turnley's opinion to the degree that it differed from his view of the evidence overall and the RFC, namely that the RFC deemed the claimant capable of only light work with some limitations.  (R. 18).

The ALJ also addressed the findings of Dr. James Beretta, who diagnosed the claimant with cervical and degenerative disc disease.  The ALJ referenced that Dr. Beretta had treated the

claimant with injections, medication, and CES therapy, and further noted that he did not provide any work restrictions or limitations for the claimant.  (R. 19).

The ALJ summarized his view of the medical evidence of record by emphasizing that none of these physicians diagnosed the claimant as completely disabled, or recommended any treatment as serious as surgical intervention.  The ALJ also clarified that all of the physicians' opinions and diagnoses were afforded great weight to the degree that they do not conflict with the RFC assessment that he established.  (R. 19).

The ALJ then discussed the claimant's credibility.  Generally, the ALJ stated that he did not find claimant to be fully credible.  In support of this determination, the ALJ referenced  the claimant's testimony regarding her daily activities and what she testified she could do throughout the day.  Citing the fact that claimant testified to caring for her three-year-old throughout the day without outside assistance; preparing meals and doing laundry; and taking care of herself and managing personal hygiene, the ALJ found the claimant's testimony inconsistent with her claimed symptoms and limitations.  The ALJ also pointed out that some of the non-surgical treatment options prescribed to claimant, such as medication and physical therapy, were deemed effective in mitigating her observable symptoms to a degree that would allow her to perform light work as described in the RFC assessment.  (R. 19).

The ALJ concluded that because of her past experience, age, education, and level of ability as discussed in the RFC and medical evidence on the whole, the claimant could perform light, unskilled work, with certain restrictions.  Consequently, the ALJ referenced the vocational expert's testimony stating that several jobs the claimant could perform given her diagnosed

symptoms and RFC existed in the national economy, such as storage facility rental clerk or automatic car wash attendant.  (R. 20-21).

The ALJ then stated that the vocational expert's testimony, the claimant's age, education, work experience, and the RFC all demonstrated the claimant's ability to transition to a new job, and that a finding of "not disabled" was appropriate.  (R. 21).

The claimant properly requested review of the ALJ decision through the Social Security Administration Appeals Council on June 17, 2011.  The claimant submitted to the Appeals Council new evidence from her treating physician, Dr. Ken Puckett, in the form of visit notes and a capabilities assessment completed on an insurance form for MetLife on April 26, 2011.  The Appeals Council summarily denied a hearing on May 7, 2012, acknowledging the new evidence from Dr. Puckett and entering it into the record, but declining to review the ALJ's decision.  (R. 1-7, 322-25).

## VI. DISCUSSION

The claimant argues that the insurance form and visit notes from Dr. Puckett submitted and entered into the record as Exhibit 7F from April 26, 2011 constituted "new and material" evidence, and that the Appeals Council erred by failing to adequately consider the evidence and remand the case to the ALJ to reconsider in light of the additional evidence.  Pl.'s Br. 25.  This court agrees and finds that the Appeals Council failed to sufficiently justify its failure to remand the case to the ALJ by offering more than a cursory affirmation of the ALJ's decision despite new evidence that reasonably might have affected the case's outcome.

When new, non-cumulative, and material evidence is properly entered into the record after the ALJ's decision, failure to properly consider such evidence may be grounds for a remand.

*Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). The submission of evidence after the ALJ's decision is justified if the evidence did not exist until that time. *Id.* Such evidence is considered "material" if "there is a reasonable possibility the new evidence would change the administrative outcome." *Id.*

The Appeals Council may not merely "perfunctorily adhere" to the ALJ's general reasoning when it considers such new evidence yet upholds the ALJ's decision. *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1987); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007) (holding that remand was appropriate in light of new evidence presented to the Appeals Council to determine if the ALJ's finding was still supported by substantial evidence). This court has the authority to remand a case based on such evidence pursuant to 42 U.S.C. § 405(g). *Id.*; *see also* 20 C.F.R. §§ 404.940, 404.946.

In the present case, the new evidence submitted by the claimant contains an assessment by the claimant's treating physician, Dr. Ken Puckett, that occurred after the ALJ hearing but before the ALJ decision and Appeals Council review. In the denial for review, the Appeals Council acknowledged the evidence and included it in the record, but in doing so only provided a truncated analysis by stating that the newly-submitted and other evidence along with claimant's reasons for disagreement "[do] not provide a basis for changing the Administrative Law Judge's decision." (R. 1-2).

This court finds to the contrary that the newly-submitted evidence from Dr. Puckett offers a reasonable possibility of changing the administrative outcome, and that the Appeals Council erred by offering only a "perfunctory adherence" to the ALJ's decision despite the evidence and failing to remand the case to the ALJ for reconsideration.

25

Testimony by a claimant's attending physician merits substantial or considerable weight in the absence of good cause to the contrary.  *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004).  The analysis of Dr. Puckett's opinions by the ALJ in his decision noted summarily that he disagreed with Dr. Puckett's work limitations, and emphasized Dr. Puckett had not classified the claimant as disabled.  (R. 17).  Dr. Puckett's non-cumulative statements in the newly-submitted evidence do deem the claimant effectively disabled.  (R. 323).

Therefore, given the sparse nature of the ALJ's dismissal of portions of Dr. Puckett's opinions, and in consideration of the considerable weight afforded treating physicians' testimony absent *good cause* to the contrary, this court finds that a reasonable possibility exists that this new evidence could change the outcome from the ALJ's decision.

This reasonable possibility that the new evidence would change the administrative outcome is strengthened by the fact that the hypothetical given to the vocational expert by the ALJ assumed an individual that could stand or sit for an extended period of time.  The new evidence from Dr. Puckett explicitly and strongly refutes that the claimant could work in such a fashion, or even work at all.  (R. 323).  At the very least, a reasonable chance exists that the ALJ might have fashioned his hypothetical given to the vocational expert differently in light of Dr. Puckett's new findings.

Therefore, this court finds that the Appeals Council erred by failing to properly consider the new evidence submitted by the claimant and for not remanding the case to the ALJ based upon that evidence.  This case should be reversed and remanded pursuant to 42 U.S.C. § 405(g).

### VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED AND REMANDED for reconsideration.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 27th day of September, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE